## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

_____

Harry Jerome Evans,                         **Civil No. 10-4045 (SRN/SER)**

       Petitioner,

v.                                          **REPORT AND RECOMMENDATION**

John King, Warden, Joan Fabian,
Commissioner of DOC, and Lori
Swanson, Minnesota Attorney General,

       Respondents.

_____

Harry Jerome Evans, *pro se*, #219265, MCF - Stillwater, 970 Pickett Street North, Bayport, Minnesota 55003.

Matthew Frank, Esq., Minnesota Attorney General's Office, 445 Minnesota Street, Suite 1800, Saint Paul, Minnesota, 55101, on behalf of Respondents.

Peter R. Marker & Thomas R. Ragatz, Esqs., Ramsey County Attorney, 50 West Kellogg Boulevard, Suite 315, Saint Paul, Minnesota 55102, on behalf of Respondents.

_____

STEVEN E. RAU, United States Magistrate Judge

Petitioner Harry Jerome Evans ("Evans"), currently a state inmate at the Minnesota Correctional Facility at Stillwater, filed a Petition Under U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody (the "Petition") alleging eleven grounds for relief.[1]

---

[1]     Evans's Petition lists the following grounds: (1) denial of a fair trial because of a biased juror; (2) violation of the Confrontation Clause because of limitations on Evans's ability to cross-examine a witness; (3) prosecutorial misconduct and ineffective assistance of trial and appellate counsel; (4) insufficient evidence to prove the offenses charged; (5) drawing of DNA from Evans in violation of the privilege of self-incrimination; (6) unconstitutional search and seizure because the search warrant lacked probable cause; (7) denial of Evans's right to be present at the hearing where the lawyers determined the procedures to be followed with respect to the *Schwartz* hearing; (8) violation of due process because Evans's conviction did not meet "the standard of certainty" required by law; (9) improper *ex parte* contact with a juror by the government in anticipation of the *Schwartz* hearing; (10) unconstitutional selection of the grand jury and petit

[Doc. No. 1].  Evans also filed a Motion for Stay and Abeyance, requesting a stay while he attempted to exhaust state court remedies for at least four of the grounds asserted in his Petition.  (Notice and Mot. for an Order for an Order to Stay and Abeyance, "Motion for Stay and Abeyance") [Doc. No. 3].  On August 29, 2011, this Court denied Evans's Motion for Stay and Abeyance because the claims he sought to exhaust were procedurally defaulted.  (Order dated August 29, 2011, "August 2011 Order") [Doc. No. 18 at 3]; (Report & Recommendation Dated July 29, 2011, "July 2011 R&R") [Doc. No 15].  The Court disposed of those claims, denying them and dismissing them with prejudice.[2]  (August 2011 Order at 3); (July 2011 R&R at 13).  The Court also ordered Respondents John King, Joan Fabian, and Lori Swanson (collectively, "Respondents") to respond to the merits of the remaining claims.  (August 2011 Order at 3–4).  Respondents addressed each of the outstanding grounds and requested denial of Evans's Petition.  (Resp. to Order to Show Cause, "Resp'ts Brief") [Doc. No. 21].  Evans subsequently filed a response and Motion for Leave to Amend his Petition.  (Resp. to Resp'ts Brief & Evidentiary Hr'g Requested, "Evans's Brief") [Doc. No. 23]; (Mot. for Leave to Amend) [Doc. No. 24].  The matter has been referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and District of Minnesota Local Rule 72.1(a).  For the reasons set forth below, this Court recommends denial of Evans's Petition with prejudice and denial of his Motion to Amend as moot.

---

jury; and (11) denial of due process based on new evidence establishing innocence.  (July 2011 R&R at 7); (Pet. at 5–9).

[2]      The Order dismissed Grounds Five, Six, Seven, and Ten of Evans's Petition.  (August 2011 Order at 3); (July 2011 R&R at 13).

# I.       FACTUAL AND PROCEDURAL BACKGROUND

After a jury trial, Evans was found guilty and convicted of first-degree murder (in violation of Minnesota Statute § 609.185(a)(4)).[3]  *State v. Evans* (*Evans I*), 756 N.W.2d 854, 859 (Minn. 2008).  He was sentenced to life in prison without the possibility of release.  *Id.* at 862. On appeal, the Minnesota Supreme Court affirmed his conviction in 2008 following a remand to the trial court to develop a potential juror bias claim record.  *Id.* at 863–64.  In August 2009, Evans filed a petition for postconviction relief.  *Evans v. State* (*Evans II*), 788 N.W.2d 38, 41 (Minn. 2010).  The district court denied that petition and the Minnesota Supreme Court affirmed. *Id.* at 49.  The opinions of several courts have detailed the facts of the underlying crime that led to Evans's conviction and the procedural background of this matter.[4]  Those facts are repeated here only to the extent they are relevant to Evans's federal habeas claims.

---

[3]       Minnesota Statute § 609.185(a)(4) provides, in relevant part:

> **609.185 Murder in the first degree**
> Whoever does any of the following is guilty of murder in the first degree . . . .
> . . .
> (4) **causes the death of a peace officer** or a guard employed at a Minnesota state or local correctional facility, with intent to effect the death of that person or another, while the peace officer or guard is engaged in the performance of official duties.

Minn. Stat. § 609.185(a)(4) (emphasis added).

[4]       Order Dated August 29, 2011 [Doc. No 18]; Report & Recommendation Dated July 29, 2011 [Doc. No 15]; *Evans v. State* (*Evans II*), 788 N.W.2d 38 (Minn. 2010); *State v. Evans* (*Evans I*), 756 N.W.2d 854 (Minn. 2008).  Respondents did not provide an administrative record or appendix containing the relevant excerpts from the trial transcript.  [Doc. No. 22].  The Court has not been provided with any trial transcripts for its review.  For that reason, the orders from the state courts and this Court's prior opinions provide the facts and procedural history for this Report and Recommendation.

## II.    STANDARD OF REVIEW

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (codified as amended in scattered sections of 28 U.S.C.) ("AEDPA") prescribes the standards that govern this Court's substantive review of Evans's Habeas Petition.  The relevant portion of AEDPA provides that:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 405–11 (2000), the United States Supreme Court discussed application of the AEDPA.  State court decisions are "contrary to" Supreme Court precedent under § 2254(d) when the state court:  (1) reaches a conclusion opposite to the Supreme Court on a question of law; or (2) arrives at a result opposite to Supreme Court precedent involving "materially indistinguishable" facts.  *Id.* at 405.  The "unreasonable application" clause of § 2254(d)(1) provides that even if the state court correctly identifies the relevant Supreme Court principle, a prisoner's writ may be granted if the state court applied the principle unreasonably to the facts of the case.  *Id.* at 413.  The standard for determining whether a state court's decision is an "unreasonable application," is "whether the state court's application of clearly established federal law was **objectively unreasonable**. . . ." *Id.* at 409 (emphasis added).  A writ may not be issued simply because the federal court concludes the state court's

4

application of federal law was erroneous or incorrect, but only where the state court's decision was also unreasonable. *Id.* at 411.

A writ of habeas corpus may also be available where the state courts' resolution of a prisoner's criminal case is "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Habeas relief can, therefore, be granted if the conviction is based on findings of fact that could not be derived reasonably from the state court evidentiary record. When reviewing a state court decision, however, "a federal court . . . presumes that the state court's factual determinations are correct," and such a presumption "may be rebutted only by clear and convincing evidence." *Lee v. Gammon*, 222 F.3d 441, 442 (8th Cir. 2000).

A federal district court is not allowed to conduct its own *de novo* review of a prisoner's constitutional claims. Habeas relief cannot be granted unless the prisoner has identified, and substantiated, the specific state court error. A prisoner must also demonstrate that the error is actionable under the Supreme Court's interpretation of § 2254(d).

This standard applies only when a claims has been fairly presented to, and decided on the merits by, the highest available state court. *See Baldwin v. Reese*, 541 U.S. 27, 29 (2004) (citations omitted); *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999). When a state court remedy is available for a petitioner's unexhausted claim, the federal court must defer the action until the claim is exhausted. *Armstrong v. Iowa*, 418 F.3d 924, 926 (8th Cir. 2005). When a petitioner has not exhausted his state court remedies, however, and state procedural rules preclude further attempts to do so, that claim is procedurally defaulted. *Coleman v. Thompson*, 501 U.S. 722, 750 (1991); *McCall v. Benson*, 114 F.3d 754, 757 (8th Cir. 1997). Only if a petitioner shows "cause and prejudice" to excuse the procedural default or, in the alternative, that

there would be a "fundamental miscarriage of justice" will a procedurally defaulted claim be considered. *Coleman*, 501 U.S. at 749–50.

## III.    DISCUSSION

Affording Evans's Petition the liberal construction to which it is entitled, this Report and Recommendation will consider the seven remaining claims: (1) Denial of Fair Trial Because of Biased Juror (Petition Ground One), (2) Violation of Confrontation Clause Based on the Trial Court's Evidentiary Rulings (Petition Ground Two), (3) Ineffective Assistance of Trial Counsel (Petition Ground Three), (4) Ineffective Assistance of Appellate Counsel (Petition Ground Three), (5) Prosecutorial Misconduct (Petition Grounds Three and Nine), (6) Insufficient Evidence to Prove the Offenses Charged/Violation of Due Process Because Evans's Conviction Did Not Meet "the Standard of Certainty" Required by Law (Petition Grounds Four and Eight), and (7) Denial of Due Process Based on New Evidence (Petition Ground Eleven). *Estelle v. Gamble*, 429 U.S. 97, 106 (1976); (Pet. at 5–9). Four Grounds are addressed on the merits and denial is recommended. The other three Grounds should be denied as procedurally defaulted.

First, Grounds One and Two are considered on their merits and rejected. Ground Three of Evans's Petition is a hodgepodge of accusations concerning all of the lawyers involved in his case. Evans asserts ineffective trial and appellate counsel, as well as prosecutorial misconduct. Claims relating to the alleged ineffectiveness of trial counsel are procedurally barred. Evans's claims regarding his appellate counsel and the prosecutor are addressed on the merits and rejected. Then, Grounds Four and Eight are conflated and analyzed together because, when construed properly, they present the same argument—that there was insufficient evidence to establish that Vick was on duty at the time of his death and, therefore, Evans's conviction is improper. (Pet. at 5, 8). These claims should be dismissed because they were not fairly

presented to the state courts and, therefore, not proper for review.  Finally, Ground Eleven is also

dismissed because Evans failed to fairly present it to the state court.

### A.  Denial of Fair Trial Because of Biased Juror (Petition Ground One)

Ground One of Evans's Petition alleges that a biased juror sat on his jury, violating his

right to a fair trial.  (Pet. at 4); (Evans's Brief at 6–9).  When initially presented with this claim,

the Minnesota Supreme Court remanded the case to the trial court with instructions for further

proceedings on the matter, while retaining jurisdiction.  *Evans I*, 756 N.W.2d at 859, 863–64.

The trial court conducted a *Schwartz* hearing and concluded that Evans failed to prove the juror

was racially biased.[5]  *Id.* at 864–67.  The Minnesota Supreme Court concluded that Evans was

not denied a fair trial or an impartial jury and affirmed.  *Id.* at 871.  This Court agrees with

Respondents that the Minnesota Supreme Court did not unreasonably apply United States

Supreme Court precedent in affirming the trial court's denial of Evans's juror bias challenge.

(Resp'ts Brief at 7–9).

### 1.  Relevant Facts

On the second day of testimony at trial, the court received a telephone call "from

someone who had some allegations about racism to make against one of [the] seated jurors."

*Evans I*, 756 N.W.2d at 862 (citation omitted in original).  At the judge's instruction, the clerk

called the person back and then relayed the details received from the caller to the judge.  *Id.*  The

judge communicated that information to the attorneys and told them that the court only knew the

---

[5]      In Minnesota, a *Schwartz* hearing, named after *Schwartz v. Minneapolis Suburban Bus Co.*, 104 N.W.2d 301 (1960), is a procedure used to investigate an allegation of juror misconduct.  *State v. Kelley*, 517 N.W.2d 905, 908 n.2 (Minn. 1994) (citing *Schwartz*).  At such a hearing, jurors are examined in the presence of counsel, on the record, and under oath, to determine whether misconduct occurred and, if so, whether it was prejudicial.  *Id.*; *see also* Minn. R. Crim. Pro. 26.03, subd. 9.

caller's name and telephone number. *Id.* The judge also provided the attorneys the name of the allegedly racist juror. *Id.*

After an overnight break, Evans requested that the court investigate the complaint to "make [a] discreet inquiry of [the caller] to determine the person's credibility and whether there is anything more that should be pursued in this area and bring the information back to us." *Id.* at 862–63 (citation omitted in original). In the alternative, Evans asked the court to allow him to conduct his own investigation. *Id.* at 863. Evans's motion was denied and the court cited concerns that an investigation during trial would be disruptive to the jury system. *Id.* Specifically, the court expressed concern about "the operation and integrity of our jury service" and the potential "effect of encouraging people to call in with false . . . accusations or anything they know about jurors." *Id.*. The court also noted, however, that "this may be [the] subject of a *Schwartz* hearing later." *Id.* The court labeled Evans's request "a motion for me to give you the phone number," and denied it. *Id.*

After trial, Evans filed a motion for disclosure of information about the telephone caller. *Id.*; (Notice of Mot. and Mot. for Disclosure of Juror Information, Admin. R. at 62–71). Evans's memorandum was unequivocal that he believed it was premature to request a *Schwartz* hearing. *Id.*; (*Id.* at 65). The district court denied the motion, noting a concern about "paralyz[ing] the jury system." *Id.*; (*Id.* at 78).

On direct appeal, the Minnesota Supreme Court reviewed the trial court's denial of Evans's motions to access to the caller's information for abuse of discretion.[6] *Id.* at 864. The

---

[6]  The court interpreted Evans's motions during and after the trial as motions for a *Schwartz* hearing. *Evans I*, 756 N.W.2d at 863–64. Although Evans had not explicitly requested a *Schwartz* hearing in either motion, his post-trial motion stated that it was made "to determine if a *prima facie* case can be made to obtain a *Schwartz* hearing." *Evans I*, 756 N.W.2d at 864; (Admin. R. at 65). The court found that his motion during trial was made presumably for the

court first considered the motion Evans made during trial and found the district court's concerns about the sanctity of the jury system were well-founded, concluding the trial court did not err. *Id.* at 864.   Then, the Minnesota Supreme Court considered Evans's post-trial motion.   *Id.*   It explained that the post-trial motion was a different matter because concerns about the disruption of the jury system must be weighed against a defendant's right to a fair trial and impartial jury. *Id.*   In the course of its review, the Minnesota Supreme Court found that the record lacked adequate information about what the telephone caller said and which juror was at issue.   *Id.*   The court noted that because the caller left both a name and phone number, she had more apparent credibility than an anonymous caller and concluded that the trial court abused its discretion when it denied that motion.   *Id.*   It retained jurisdiction and remanded to the trial court with instructions to release information about the telephone caller to the parties, so that they could conduct an investigation and, if warranted, move for additional proceedings on the issue of juror bias. *Id.*

On remand, the district court gave both parties the law clerk's notes, the transcript of the juror's *voir dire*, the juror's questionnaire, and relevant telephone records.   *Id.*   The caller was interviewed, and the court subsequently granted Evans's motion for a *Schwartz* hearing.   *Id.*   The *Schwartz* hearing proceeded with testimony from the caller, C.A., who testified that she worked as a pull-tab vendor at a neighborhood bar during Evans's trial.   *Id.* at 865.   She knew the juror as a "regular" who "came in every day of the week."   *Id.*   She testified that one afternoon the juror and her husband were at the bar watching news coverage of Hurricane Katrina.   *Id.*   As C.A. walked up to the bar, the juror looked at the television screen, looked at C.A., and said, "Isn't it amazing how God works in mysterious ways, how he wiped . . . out a good portion of

---

same reason.   *Id.*   Because the Minnesota Supreme Court reviews the denial of motions for *Schwartz* hearings for abuse of discretion, it applied that same standard to Evans's motions.   *Id.*

the n-----s off the face of the earth." *Id.*  C.A. said that she was so upset by the comment that she reported it to a coworker and her manager, both of whom confirmed hearing C.A.'s report of the incident at the *Schwartz* hearing.  *Id.*  C.A. testified that because the juror told her that she was serving as a juror in a "high-profile trial," C.A. reported the comment to the trial court within a few days of the incident.  *Id.*  C.A. said that the juror was commonly known at the bar as racially biased and typically used racial slurs.  *Id.*  C.A.'s coworker and manager testified that they believed the juror to be "generally prejudiced."  *Id.* at 865–66.

The juror also testified at the hearing and denied making the statement.  *Id.* at 866.  She said that she became a regular patron at the bar nearly forty years earlier and visited the bar during the trial.  *Id.*  She denied making the statements.  *Id.*  When she first learned of the allegation from a news reporter who visited her house, she testified that she was "dumbfounded," was "in shock," and "almost passed out."  *Id.*  The juror denied using racial slurs or even knowing the meaning of particular slurs, and said that it is inappropriate to use racist language. *Id.*  She further testified that she had good relationships with African-Americans.  *Id.*  She admitted that she and other bar patrons had some "bad dealings" with C.A. and other pull-tab vendors, but could not otherwise think of any reason why C.A. would be upset with her.  *Id.*

The juror was also asked about her responses to three race-related questions on the juror questionnaire: (1) Question 57, "Have you, or anyone close to you, had any positive or negative experiences with any African American people that would [a]ffect your ability to be a fair and impartial juror in this case?"; (2) Question 58, "Are there ethnic or racial groups of people which you do not care to associate with?"; and (3) Question 59, "Do you believe that you have ever been the victim of discrimination on the basis of race or color?"  *Id.*  She answered each question

negatively and testified that she answered "truthfully and completely all questions" on the juror questionnaire. *Id.*

At the end of the *Schwartz* hearing, the court granted Evans's motion for a continuance. *Id.* The hearing resumed four days later and the State presented five additional witnesses. *Id.* Each of the State's witnesses testified "they had never heard the juror make a racist comment, known her to have any difficulties with persons of color, personally had any difficulties with the juror, or felt the object of prejudicial behavior by the juror."[7] *Id.* Evans elected not to call any additional witnesses, but moved for judgment of acquittal or for a new trial based on C.A.'s description of the juror's comments. *Id.*

The trial court denied the motions and found that Evans failed to prove by a preponderance of the evidence that the juror made the racially-biased statements alleged or that a racially-biased individual sat on the jury. *Id.* at 870. The trial court reasoned that both sides questioned the juror during *voir dire* and her answers under oath "did not contain even a hint that this juror harbored any actual or implied bias against African-Americans." (K2-05-1688 Order Dated Oct. 23, 2007, *id.* at 207). The trial court further noted that neither party made any follow-up inquiry about her racial attitude, exercised a preemptory challenge, or struck the juror for cause. (*Id.*). The trial court explained that "[t]he face-to-face questioning, listening, and observing allowed to the parties during *voir dire* is something that is precious to our system. Bias and prejudice are often conveyed by more than mere words. A person's demeanor can be revealing." (*Id.*). The court emphasized that there was "absolutely nothing presented at any hearing challenging the juror's conduct during the trial or during deliberations." (*Id.* at 208).

---

[7]     "The State's five witnesses included the Filipino owner of the neighborhood bar the juror frequented, a regular patron of the bar who is of African-American and Caucasian race, and three of the juror's coworkers, all of whom are persons of color." *Id.* at 866 n.13.

Ultimately, the court concluded that Evans failed to meet his burden of proving that the juror was incapable of sitting as a fair and impartial juror because of prejudice against African-Americans. (*Id.*).

On appeal, the Minnesota Supreme Court evaluated the trial court's decision for clear error and affirmed.[8]  *Id.* at 871.  It noted that the trial court appeared to find C.A.'s testimony was not credible and that the juror was honest when responding to race-related questions on the jury questionnaire and stating that racist language was inappropriate.  *Id.* at 870–71.  The court also recognized evidence that did not support the trial court's finding, but noted that "in the end" it was confined by the standard of review and could not conclude that the trial court's finding was clearly erroneous.  *Id.* at 871.

### 2.  Analysis

A defendant has a constitutional right to an impartial jury.  *See Irvin v. Dowd*, 366 U.S. 717, 722 (1961).  The remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.  *Smith v. Phillips*, 455 U.S. 209, 215 (1982); *Schwartz*, 104 N.W.2d at 304.  To succeed on a juror bias claim, a petitioner "must show that the juror was actually biased against him."  *Goeders v. Hundley*, 59 F.3d 73, 75 (8th Cir. 1995).  To demonstrate actual bias, a petitioner must show "an impermissible affirmative statement." *Williams v. Norris*, 612 F.3d 941, 954–55 (8th Cir. 2010).  Federal courts performing habeas review defer to a state court finding of juror bias if the record fairly supports that finding. *Antwine*, 54 F.3d at 1359.  Furthermore, the determination by the trial judge that jurors are qualified is a question of fact, subject to a presumption of correctness.  *Antwine v. Delo*, 54 F.3d 1357, 1359 (8th Cir. 1995); *Goeders*, 59 F.3d at 75.

---

[8]      Justice Alan Page dissented, emphasizing that *Schwartz* and Rule 26.03 "clearly prohibited" contact between parties and jurors outside the hearing context.  *Id.* at 883 (Page, J. dissenting).

The state courts properly granted Evans's request for a hearing to prove actual bias. *Phillips*, 455 U.S. at 215.  At both the initial and continued *Schwartz* hearings, Evans had the opportunity to introduce his own witnesses  and thoroughly cross-examine C.A., the juror, and additional witnesses.  The only direct testimony supporting a conclusion that the juror made the statement alleged—or any other racially biased statement—came from C.A.   The State introduced at least five witnesses who testified that, in their experience with the juror, there was no basis to believe she was biased.  The juror herself also denied that she was racially biased.  Based on these proceedings, the trial court found that there was no showing of actual bias. *Evans I*, 756 N.W.2d at 871.   That determination is supported by the record and entitled to deference.  *See Antwine*, 54 F.3d at 1369; *Goeders*, 59 F.3d at 75; *Williams*, 612 F.3d at 954.  Evans failed to show that the state courts' decisions were inconsistent with federal law or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C § 2254(d)(1)–(2).  Thus, his Petition should be denied on this Ground.

## B.  Violation of Confrontation Clause Based on the Trial Court's Evidentiary Rulings (Petition Ground Two)

Evans argues that the trial court's exclusion of an eyewitness's medical records violated his constitutional right to present a complete defense under the Sixth Amendment because it improperly limited his ability to cross-examine that eyewitness.  Because Evans cannot establish that the state court's determination was contrary to or an unreasonable application of federal law, Ground Two of his Petition should be denied.

### 1.   Relevant Facts

J.M. testified as an eyewitness to the shooting.  *Evans I*, 756 N.W.2d at 861.  Along with his parents, J.M. was travelling home from a visit to Regions Hospital at about 2:00 a.m. on May 6, 2005.[9]  *Id.*  While their car was stopped at a traffic light, J.M. saw two African-American men, a tall man and a shorter companion, across the intersection.  *Id.*  The tall man stood in front of another car stopped at the light, and when the tall man began to walk away, the driver of the other car started chasing the men on foot.  *Id.*  The short man tripped and fell attempting to get away from the driver.  *Id.*  When the short man got up, J.M. saw him pull a gun from his pants and shoot the man who was chasing him.  *Id.*  J.M. testified that the short man was only "'[a] matter of feet'" from the man and the tall man was approximately twenty yards from where the shooting took place.  *Id.* (citation omitted in original).

During preparation for trial, Evans learned that J.M. agreed to go to Regions Hospital on the night of May 5, 2005 after a family intervention.  *Id.* at 871.  In police interviews, J.M.'s mother described the intervention and said that she hoped the police got a good interview with J.M. "'because he is schizophrenic.'"  *Id.* (citation omitted in original).  She acknowledged, however, that J.M. had not actually received a diagnosis of schizophrenia.  She also said that he was delusional and she was "'glad you got him now because was very, very sensible'" on the night of the shooting.  *Id.* at 871–72.  J.M's father said that J.M. was "'having very bad hallucinations, and people are after him,'" but said that J.M. "'was fine'" the night of the shooting.  *Id.* at 872.

---

[9]      J.M. was thirty-eight years old at the time of trial.  *Id.* at 861 n.5.

Based on the police interviews of J.M.'s parents, Evans moved for an *in camera* examination of all of J.M.'s medical/psychiatric/psychological records that could assist Evans in preparing for his defense. *Id.* at 872; (Mem. in Supp. of Mot. for Disc. of Witness's Medical Records, *id.* at 81–87). Evans argued that J.M. had a history of mental health issues and had been "delusional, schizophrenic, and ma[de] up stories" in the past. (*Id.* at 86). He asserted that the medical records could be "extremely helpful to the defense" because they could provide evidence of "possible bias or fabrication by a witness." (*Id.*). The trial court granted the motion in part, agreeing to review *in camera* only the records from J.M.'s May 5, 2005 visit to Regions Hospital. *Id.*

On direct appeal, Evans argued that the district court's decision to review only the May 5, 2005 records was too narrow because "'details about his underlying mental health problems may not have been part of the May 5 Regions records.'" *Id.* (citation omitted in original). Evans also argued that the trial court redacted too much information from the records it provided. *Id.* at 873–74. Rejecting these claims, the Minnesota Supreme Court stated that Evans "did not make any showing that any medical records existed prior to or after the May 5 visit that would have been material and favorable to Evans's ability to cast doubt on J.M.'s credibility." *Id.* at 873. The court also reviewed the May 5, 2005 record, finding that access to information potentially probative of J.M.'s credibility provided the appropriate balance between J.M's privacy and Evans's confrontation rights. *Id.* at 872–73.

## 2. Analysis

While decisions regarding the admissibility of evidence in a state trial are a matter of state law that do not ordinarily form the basis for federal habeas relief, a federal court may grant habeas relief if the alleged error "infringes upon a specific constitutional protection or is so

prejudicial that it amounts to a denial of due process." *Clark v. Groose*, 16 F.3d 960, 963 (8th Cir. 1994) (citation omitted); *see Manning-El v. Wyrick*, 738 F.2d 321, 322 (8th Cir. 1984). The Sixth Amendment to the Constitution guarantees a defendant "the opportunity for effective cross-examination of witnesses against him." *United States v. Warfield*, 97 F.3d 1014, 1024 (8th Cir. 1996) (citation omitted). That right may be violated if a defendant is prevented from exposing facts that would allow a jury to make inferences about the reliability of the witness reasonably. *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Trial judges, however, "retain wide latitude . . . to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Delaware*, 473 U.S. at 679. Limitations on cross-examination will not be overturned absent a showing that the trial court abused its discretion and prejudice resulted. *United States v. Turner*, 189 F.3d 712, 717–18 (8th Cir. 1999). A key factor in determining whether limitations violated a defendant's rights is whether the defendant retained other means to elicit the same information or obtain the same effect the excluded examination allegedly would have had. *United States v. Campbell*, 845 F.2d 782, 788 (8th Cir. 1988).

Evans sought J.M.'s medical records because he claimed they would allow the jury to evaluate J.M.'s credibility. (Mem. in Supp. of Mot. for Discovery of Witness's Medical Records, *id.* at 82–87). Evans's explication of this claim does not identify what the records would have revealed or one question that he wished to pose to J.M. on cross-examination based on the records. As a result, it is impossible to directly address the particular cross-examination restrictions—whatever they may be—that gave rise to Evans's current claim.

Moreover, Evans was not denied the opportunity to cross-examine J.M. and retained several substantial means of challenging J.M.'s credibility, notwithstanding the trial court's restrictions on his cross-examination.  The trial court permitted defense counsel to impeach J.M. with prior inconsistent statements that J.M. made to police immediately after the incident and during his testimony at the grand jury.  Further, even with the restrictions, defense counsel was able to effectively cross-examine J.M. about the family intervention, "whether he was on his way home from the hospital when he witnessed the shooting, how long he was at the hospital, the reason for his visit, and whether a doctor saw any reason for him to remain at the hospital." *Evans I*, 756 N.W.2d at 874.  In addition, J.M.'s parents testified on behalf of Evans.  *Id.* at 874 n. 24.  J.M.'s father testified that he and his family had "a meeting trying [to] get some help for [J.M.]."  *Id.* at 874 n.24.  J.M.'s mother similarly testified that J.M. had "'been suffering from marital problems and seemed depressed and the like.'"  *Id.*  Thus, Evans was able to cross-examine J.M. and his parents about the family intervention, the reason for going to the hospital, and Evans's mental state leading up to the family intervention—all facts that the jury could properly consider in weighing J.M.'s credibility.

Evans was not able to cross-examine J.M. exactly as he wished, but he did cross-examine him effectively, which what the Supreme Court requires.  *Delaware v. Fensterer*, 474 U.S. 15, 20 (1985).  The state court's adjudications were neither contrary to, nor an unreasonable application of, clearly established federal law.  As such, the Court recommends denial of Ground Two.

### C. Ineffective Assistance of Counsel and Prosecutorial Misconduct (Petition Ground Three)

Evans claims that prosecutorial misconduct and ineffective assistance of his trial and appellate counsel "permeated from [the] beginning of trial up to post-conviction proceedings."

(Pet. at 6); (Evans's Brief at 14).  He failed to provide an explanation of his claims or tie them to any facts in his Petition and responsive memorandum.[10]  (Pet. at 6); (Evans's Brief at 13–16). Evans "incorporated by reference," however, the factual bases recited in *pro se* briefs to the Minnesota Supreme Court on direct appeal and on appeal from the postconviction court. (Evans's Brief at 16); (Admin. R. at 117–29; 358–83).

Evans's claim for ineffective assistance of trial counsel should be dismissed because it is procedurally defaulted.  His claim for ineffective assistance of appellate counsel is comprised of two components: (1) claims based on his appellate counsel's failure to challenge the effectiveness of his trial counsel and (2) his appellate counsel's failure to file a motion seeking new counsel to represent Evans at the *Schwartz* hearing.  Proper review of Evans's claims regarding his appellate counsel requires a determination of the merits of his trial counsel claims. Accordingly, in spite of the fact that they are procedurally defaulted, his claims for ineffective assistance of trial counsel are analyzed.  Ultimately, both components of his ineffective assistance of appellate counsel claim are rejected as meritless.  Next, Evans's prosecutorial misconduct claims are placed into three categories: (1) attempts to bring in allegedly irrelevant or inadmissible evidence, (2) improper attempts to influence the jury, and (3) improper *ex parte* contact with a juror by the government in anticipation of the *Schwartz* hearing.  In the third category, the Court construes Evans's assertions in Ground Nine of his Petition as an additional basis for prosecutorial misconduct.  All three of these categories are found to be meritless and rejected.

---

[10]     The only instance of prosecutorial misconduct arguably described by Evans in his Petition is found in Ground Nine, his claim that the State had improper *ex parte* communication with the juror prior to the *Schwartz* hearing.  (Pet. at 8).  Based on Evans's arguments to the state courts and in his Petition, the Court construes Ground Nine as a factual bases to support his claim of prosecutorial misconduct.  (*Id.*); (Admin. R. at 222–33).  Accordingly, it is addressed in this section.  *See infra* Section C.3.iii. at 36.

### 1.   Ineffective Assistance of Counsel Claims

The Sixth Amendment guarantees a criminal defendant the right to effective assistance of counsel. *Strickland v. Washington*, 466 U.S. 668, 686 (1984). To state a claim for ineffective assistance of counsel, a petitioner must demonstrate that (1) counsel's representation was deficient and (2) the deficiency prejudiced his case. *See Miller v. Dormire*, 310 F.3d 600, 602 (8th Cir. 2002) (citing *Strickland*, 466 U.S. at 687–88). Both prongs of the *Strickland* test must be satisfied to obtain relief; if either prong is unproven, the reviewing court need not analyze the other prong. *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996).

The first prong requires a petitioner to demonstrate that counsel "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Under this prong, the petitioner must show that counsel's representation was objectively unreasonable. *Stacey v. Solem*, 801 F.2d 1048, 1051 (8th Cir. 1986); *see also Theus v. United States*, 611 F.3d 441, 446–47 (8th Cir. 2010) (analyzing a § 2255 petition). In conducting such a review, courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689. Put simply, counsel's "strategic choices made after thorough investigation are virtually unchallengeable" in a habeas corpus action. *Id.*

*Strickland*'s second prong requires the petitioner to show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. It is not sufficient for a defendant to show that the error had some "conceivable effect" on the result of the proceeding. *Id.* at 693. Logically, then, when a legal argument is meritless, a defendant cannot be prejudiced as a consequence of its absence as an appellate issue. *See Thompson v. Jones*, 870 F.2d 432, 434–35 (8th Cir. 1988). In

the context of § 2254 ineffective assistance of counsel claims, the question is not whether a federal court believes the state court's determination under *Strickland* was correct, but whether that determination was unreasonable—a substantially higher threshold. *Knowles v. Mirzayance*, 556 U.S. 111, 112 (2009) (internal citations omitted).

### i.  Ineffective Assistance of Trial Counsel

Minnesota's *Knaffla* rule provides that all matters raised on direct appeal and all claims known but not raised, are barred from consideration in a subsequent post-conviction petition. *McCall*, 114 F.3d at 757 (citing *State v. Knaffla*, 243 N.W.2d 737, 741 (1976)).  If a Minnesota appellate court refuses to consider a claim on the merits because of the *Knaffla* rule, that claim is procedurally defaulted for purposes of review in federal habeas proceedings.  *Id.* at 757–58. Only if a petitioner shows "cause and prejudice" to excuse the procedural default or, in the alternative, that there would be a "fundamental miscarriage of justice," will a procedurally defaulted claim be considered.  *Coleman*, 501 U.S. at 749–50.

Evans claimed his trial counsel was ineffective for the first time in his postconviction petition.  *Evans II*, 788 N.W.2d at 43–44.  The Minnesota Supreme Court found that Evans's claim was *Knaffla* barred because he should have raised it on direct appeal.  *Id.* at 44.  Therefore, Evans's ineffective assistance of trial counsel claims are procedurally defaulted for federal habeas corpus purposes.  *Coleman*, 501 U.S. at 750; *McCall*, 114 F.3d at 757.

No reason excusing Evans's procedural default is asserted and nothing in the record suggests that his failure to comply with Minnesota's *Knaffla* rule was the result of any external impediment.  Therefore, Evans failed to satisfy the "cause" component of the cause and prejudice exception, and it is unnecessary to consider whether he could satisfy the prejudice component.  *Ashker v. Class*, 152 F.3d 863, 871 (8th Cir. 1998).  Nor can Evans present new,

compelling evidence that would establish conclusively he is innocent.[11]   *Coleman*, 501 U.S. at 750; *Storey*, 603 F.3d at 524.   Therefore, neither exception permits Evans to overcome his procedural default on his claim of ineffective assistance of trial counsel.

### ii.   Ineffective Assistance of Appellate Counsel

Evans first raised his arguments regarding the effectiveness of his appellate counsel in his petition for postconviction relief.   *Evans II*, 788 N.W.2d at 44.   On appeal from the postconviction court, Evans claimed he was denied his right to effective assistance of appellate counsel because his appellate attorney failed to (1) challenge the effectiveness of his trial counsel and (2) file a motion seeking new counsel to represent Evans at the *Schwartz* hearing.   *Id.* at 45. The Minnesota Supreme Court found both claims were meritless.   *Id.*   Because that conclusion was neither contrary to, nor an unreasonable application of federal law, Evans's Petition should be denied on this basis.

### a.   Failing to Challenge the Effectiveness of his Trial Counsel

Ineffective assistance claims cannot be based on counsel's alleged failure to raise a meritless argument.   *See Gray v. Bowersox*, 281 F.3d 749, 756 n.3 (8th Cir. 2002), *cert. denied*, 537 U.S. 1115 (2003).   Further, when a legal argument has no merit, it follows that a defendant cannot be prejudiced as a consequence of its absence as an appellate issue.   *See Thompson*, 870 F.2d at 434–35.   Evans claim of ineffective assistance of appellate counsel claim has merit only if his claims regarding the effectiveness of his trial counsel have merit.   In other words, appellate counsel is not ineffective simply because that lawyer fails to raise an issue on appeal that has no substance.   Accordingly, although Evans's ineffective trial counsel claims are procedurally defaulted, they will be considered here.   Based on Evans's *pro se* Post-Conviction Brief, claims

---

[11]   For an evaluation of the "new evidence" Evans claims establishes his innocence see *infra* Section E. at page 44.

of ineffective trial counsel alleged not pursued by appellate counsel fall into four categories: (1) Fourth Amendment Violations, (2) Fifth Amendment Violations, (3) Jurisdictional Challenges, and (4) Subpoena Cover Letter Issue.  (Admin. R. at 361–73, 375–76).  As explained below, each of these claims is meritless and, accordingly, his appellate counsel was not ineffective for failing to assert them.

### Fourth Amendment Violations

Evans argues that his trial counsel was ineffective for failing to advance two arguments based on alleged violations of his Fourth Amendment rights.  First, Evans claims his attorney was ineffective for failing to argue that his arrest was unlawful because the arrest warrant was fatally defective.  (*Id.* at 362).  Second, he argues his trial counsel was ineffective for failing to move to suppress evidence seized under a search warrant that purportedly lacked probable cause. (*Id.* at 363–66).  Because neither of these claims has merit, his appellate counsel was not ineffective for omitting these issues on direct appeal.

Evans asserts the arrest warrant here was defective because his name appeared in all capital letters on it.  (*Id.* at 362–63).  Therefore, he claims, the warrant did not identify him with sufficient particularity and his trial counsel was ineffective for failing to challenge the lawfulness of his arrest.  (*Id.* at 362).  The Minnesota Supreme Court explained that the state's controlling rule of criminal procedure did not prescribe the format by which a name should appear on a warrant.  *Evans II*, 788 N.W.2d at 46.  Finding that the warrant properly identified Evans, the court rejected his assertion.  *Id.* at 46.

Evans's argument is one of form with no substance.  He does not dispute that the arrest warrant bore his true name.  Rather, he believes it lost the requisite particularity required under the Fourth Amendment because his name appeared in capital letters.  *See* U.S. Const. amend. IV

(requiring that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing . . . persons or things to be seized"); (Admin. R. at 362–63).  This argument is absurd.  Indeed, several cases provide that even inadvertent errors in the spelling of a suspect's name on a search warrant or affidavit will not invalidate the search warrant.  *See, e.g.*, *United States v. Hudspeth*, 525 F.3d 667, 673 n.3 (8th Cir. 2008) (citations omitted) (holding that an affidavit referring to an individual as "Burton" instead of "Bunch" did not invalidate the warrant).  The arrest warrant here presents a lesser threat to the Fourth Amendment's purpose than clerical errors or misspellings.  Evans's trial counsel had good reason for not raising this argument—there was no legal basis for it.  Evans cannot satisfy the *Strickland* test and this claim should be dismissed.

Evans also claims violations of his Fourth Amendment rights related to a search warrant executed in this case.  On the afternoon following Vick's murder, police officers executed a search warrant at Evans's residence and seized a gun cartridge matching the weapon used in the shooting.  *Evans II*, 788 N.W.2d at 46–47.  Evans argues the search violated his Fourth Amendment rights because the warrant lacked probable cause and police failed to establish a sufficient nexus between the crime and his home.  (Admin. R. at 363–66).  He asserts that his trial counsel was ineffective for failing to move to suppress the evidence obtained pursuant to the allegedly defective search warrant.  (*Id.*).

There is no credible challenge to the presence of probable cause here.  Rather, Evans relies on "mere argumentative assertions" and omits any explanation as to why the search warrant lacked probable cause.  *Id.* at 47 (citing *State v. Fort*, 768 N.W.2d 335, 342 (Minn. 2009)).  Presumably, Evans's counsel chose to forgo this argument because it lacked support.  More importantly, the record reveals that four hours elapsed between the shooting and Evans's

23

arrest.  *Id.*  As the state court explained, Evans had time "to dispose of any evidence of the crime at his residence."  *Id.*  Evans does not dispute this timeline.  *Id.*; (Admin. R. at 363–66).  His trial counsel recognized the weakness in this argument and made a strategic choice to focus on other issues; that decision is presumed correct under *Strickland*.   466 U.S. at 689.   While some attorneys may have raised the issue, it was not "objectively unreasonable" to forgo this argument in favor of others.  *Stacey*, 801 F.2d at 1051.  As such, Evans has not satisfied the first *Strickland* prong.

Even if Evans could satisfy the first *Strickland* prong, there was ample evidence of Evans's involvement in the shooting apart from the gun casing seized pursuant to the search warrant.  Evans has not established his innocence to such a degree that it is reasonably probable that he would have been acquitted or received a lesser sentence.  Thus, Evans cannot establish prejudice under *Strickland*'s second prong.

### *Fifth Amendment Violations*

Evans also contends that his trial counsel was ineffective because he failed to argue that the police violated his Fifth Amendment rights.  (Admin. R. at 361–62, 368–70).  He claims that officers acted contrary to the Fifth Amendment when they asked him to state his name before reading him his *Miranda* rights.  (*Id.* at 361–62).  He also asserts that the post-arrest booking procedures violated his privilege against self-incrimination.  (*Id.* at 368–70).

The Fifth Amendment prohibits only testimonial evidence that is compelled and incriminating.  *Hiibel v. Sixth Judicial Dist. Court of Nevada*, 542 U.S. 177, 189–90 (2004); (*Id.* at 361–62).  It cannot be violated by the introduction of voluntary statements.  *United States v. Patane*, 542 U.S. 630, 637 (2004) (citing several cases for that proposition).  Generally, asking a routine booking question does not require a *Miranda* warning.  *United States v. Lockett*, 393 F.3d

834, 837 (8th Cir. 2005) (noting that a request for routine information necessary for basic identification purposes, such as the name and address of a suspect, is not interrogation under *Miranda*, even if the information turns out to be incriminating).   Supreme Court precedent provides that "[a]nswering a request to disclose a name is likely to be so insignificant in the scheme of things as to be incriminating only in unusual circumstances." *Hiibel*, 542 U.S. at 191 (citations omitted).

Considering those principles, Evans's *Miranda* claim lacks merit.  He does not argue, and there is nothing to suggest, that the disclosure of his name to officers was anything but voluntary. Also, nothing in the record suggests that the disclosure of his name presented a reasonable danger of incrimination.  To the extent Evans asserts that police must always provide *Miranda* rights before asking for an individual's name, his counsel properly determined that established precedent eliminated that argument's credibility.   Thus, Evans's trial counsel had no basis whatsoever upon which to assert this argument and Evans cannot satisfy *Strickland*.

Evans claims that police violated his Fifth Amendment right against self-incrimination in the post-arrest booking procedures, including taking his "finger prints, measuring, photos, weight, blood breath test, dexterity, strip search, change clothes, etc. violated self-incrimination" is also without merit.  (Admin. R. at 368–70).   The constitutional privilege against self-incrimination is a bar against compelled, testimonial communications.  *Schmerber v. California*, 384 U.S. 757, 763–64 (1966).   There is a distinction between compelled testimonial communications, which is protected by the privilege, and real or physical evidence, that is unprotected.  *See Gilbert v. California*, 384 U.S. 757, 763–64 (1966).   Accordingly, "both federal and state courts have usually held that [the Fifth Amendment's self-incrimination privilege] offers no protection against compulsion to submit to fingerprinting, photographing, or

25

measurements, to write or speak for identification, to appear in court, to stand, to assume a stance, to walk, or to make a particular gesture." *Schmerber*, 384 U.S. at 765.   None of the evidence obtained in Evans's booking procedures constituted compelled, testimonial communications.   Only real or physical evidence was obtained, and *Miranda*'s protections are inapplicable.   Even if his trial counsel moved to exclude the evidence on this basis, the court would have denied the motion.   Thus, Evans cannot establish either *Strickland* prong on this claim.

### *Jurisdictional Challenges*

Evans claims that his trial counsel was ineffective for failing to argue that the trial court lacked the requisite personal and subject matter jurisdiction to proceed with his case.   (*Id.* at 367–68, 370–71, 371–73).   Evans fails to provide an explanation for how the trial court lacked personal jurisdiction, claiming simply that "[t]he [c]ourt NEVER had personal jurisdiction over Petitioner."   (*Id.* at 367–68, 371–73).   It seems Evans's basis for this claim is not that the trial court lacked jurisdiction *per se*, but that proof of that jurisdiction does not appear on the record.   (*Id.* at 367–68).   As to the trial court's subject matter jurisdiction, Evans asserts the statute under which he was convicted, Minnesota Statute § 609.185(a)(4), violates the Minnesota Constitution and state case law because it lacks an enacting clause.   (*Id.* at 370–71).   He further argues that any subject matter jurisdiction the statute imparted initially on the trial court became void when the Revisor of Statutes published it.   (*Id.* at 371).

Under Minnesota law, "a person may be convicted and sentenced under the laws of Minnesota if that person commits an offense in whole or in part within this state."   Minn. Stat. § 609.025(1).   Even if no portion of the trial explicitly addressed the appropriateness of the court's personal jurisdiction over Evans, there was no dispute over where the murder occurred:   Vick

was shot in Ramsey County, Minnesota.  *Evans II*, 788 N.W.2d at 46.  Evans was convicted and sentenced in that county's district court, thus the trial court had personal jurisdiction over him. *Id.*

Evans's subject matter jurisdiction claim is equally unavailing.  The statute under which Evans was convicted, Minnesota Statute § 609.185(a)(4), was enacted properly with a title and enacting clause.  *See* Act of May 19, 1981, ch. 227, § 9, 1981 Minn. Laws ch. 1006, 1007, 1010; *Thompson v. State*, 691 N.W.2d 841, 843 n.3 (2005).  The Revisor's Office publication did not void the statute, because such publication is not a "new enactment . . . [or] new law but merely evidence of [the seession laws]."  *Thompson*, 691 N.W.2d at 843 n.3.  Finally, to the extent Evans makes other subject matter jurisdiction arguments, the Minnesota Constitution provides that the state's "district court has original jurisdiction in all civil and criminal cases and shall have appellate jurisdiction as prescribed by law."  Minn. Const. art. VI, § 3.  The trial court had proper subject matter jurisdiction to proceed with Evans's trial.

Evans mistakes the requirements of personal jurisdiction and the enforceability of Minnesota's subject matter jurisdiction law.  In light of the state's laws, this Court cannot conclude that Evans's trial counsel's alleged failure to challenge personal and subject matter jurisdiction was objectively unreasonable.  If he had made such a challenge, it would have been denied.  Thus, Evans is unable to satisfy both prongs of *Strickland* with respect to this claim.

### Subpoena Cover Letter

Finally, Evans argues that his trial counsel was ineffective because he agreed to the language in the cover letter attached to the *Schwartz* hearing subpoenas that permitted prospective witnesses to speak "with the attorneys working on this case or with persons who are working with the attorneys."  (*Id.* at 375); *Evans I*, 756 N.W.2d at 865.  He alleges that there is a

"reasonable probability that the *Schwartz* proceeding would have turned out different" if his attorney had not agreed to the cover letter because "[t]here is a possibility that the county attorney and its investigators would have never made contact with the juror . . . [and that] the juror['s] questions and answers would have been more spontaneous[] . . .; if not different . . . [and] . . . the invited doctrine error could have never arisen." (*Id.*).

Once again, the decision with which Evans takes issue is a matter of strategy. A lawyer's strategic decision made after thorough investigation is nearly unchallengable in a federal habeas petition. *Moeller v. Weber*, 649 F.3d 839, 846 (8th Cir. 2011) (citation omitted). Even if that strategic decision proves unwise or hindsight later reveals defects in counsel's strategy, that strategy is not rendered unreasonable. *See Couch v. Trickey*, 892 F.2d 1338, 1343 (8th Cir. 1989); *Walker v. Lockhart*, 852 F.2d 379, 381 (8th Cir. 1988). Nor is counsel ineffective under constitutional standards "merely because other lawyers may have used another strategy." *Walker*, 852 F.2d at 383. Evans's attorney requested that the trial court add the cover letter to the subpoenas. *Evans I*, 756 N.W.2d at 864. The language of the letter was discussed and agreed on by both the parties. *Id.* When he received a copy of the letter mailed to the juror, Evans's trial counsel failed to object to either its content or the fact that the juror received it. *Id.* On this record, and applying the objective standard of reasonableness and the strong presumption that defense counsel's decisions were "sound trial strategy," the states courts' determination on this issue was not unreasonable. *Strickland*, 466 U.S. at 689 (citation and quotation marks omitted).

Furthermore, Evans made no effort to prove that the juror would have testified differently; his assertions are purely speculative. *See Schumacher v. Hopkins*, 83 F.3d 1034, 1037 (8th Cir. 1996). He has not demonstrated that the juror lied in her testimony or that the

28

State coerced her to attest to certain facts at the *Schwartz* hearing.  Given the strength of the prosecution's evidence, including several witnesses who testified that the juror was not racially biased, there is no reason to think that the *Schwartz* hearing would have turned out differently. *Evans I*, 865 N.W.2d at 865–67.

### b.  Failing to File a Motion Seeking New Counsel to Represent Evans at the *Schwartz* Hearing

Evans claims a conflict of interest arose with his trial counsel when Evans argued on direct appeal that his trial counsel was ineffective.  (*Id.* at 375).  He argues that conflict prevented his trial attorney from effectively representing him at the *Schwartz* hearing and, further, that his appellate counsel's failure to request different counsel to represent Evans at the *Schwartz* hearing amounted to ineffective assistance of appellate counsel. (*Id.* at 375–76).  He asserts that if his appellate counsel moved for new counsel to represent him at the *Schwartz* hearing, that attorney would have posed different questions to the juror. (*Id.* at 374–75).

Assuming for this analysis that Evans's appellate counsel's failure to move for different counsel to represent Evans at the *Schwartz* hearing was objectively unreasonable, Evans has not demonstrated prejudice with respect to this claim.  As the Minnesota Supreme Court pointed out, Evans has not "describe[d] how the result of the [*Schwartz*] hearing would have been different had appellate counsel sought the appointment of independent counsel."  788 N.W.2d at 45. Evans has not shown that but for appellate counsel's failure to file a motion for a different attorney at the *Schwartz* hearing, the outcome of the hearing would have been different.  Even if the new attorney would have would have asked different questions, Evans failed to show that those questions would uncover different, beneficial evidence that would have resulted in a new trial or other, more favorable outcome.  *Strickland*'s prejudice requirement is not satisfied.

29

### 2.  Prosecutorial Misconduct

Evans identified three instances of prosecutorial misconduct: (1) the introduction of allegedly irrelevant or inadmissible evidence, (2) attempts to influence the jury during his trial, and (3) improper *ex parte* communication with a juror prior to the *Schwartz* hearing.[12]  (Admin. R. at 124–30); (Pet. at 6, 9).  To prevail on this Ground for habeas relief, Evans must show "'(1) the prosecutor's remarks or conduct were improper, and (2) the remarks or conduct prejudicially affected the defendant's substantial rights so as to deprive him a fair trial.'"  *United States v. Ziesman*, 409 F.3d 941, 953 (8th Cir. 2005) (quoting *United States v. Beckman*, 222 F.3d 512, 526 (8th Cir. 2000)).

"'[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned . . . .  Rather, the 'relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  *Mack v. Caspari*, 92 F.3d 637, 643 (8th Cir. 1996), *cert. denied,* 520 U.S. 1109 (1997) (quoting *Darden v. Wainwright*, 477 U.S. 168, 181 (1986)).  The Court can assume, for purposes of its analysis, that the prosecutor's comments were improper and turn immediately to the issue of their prejudicial effect.  *See United States v. Jackson*, 41 F.3d 1231, 1233 (8th Cir. 1994).  If the Court reaches the second step, it considers "'(1) the cumulative effect of the misconduct, (2) the strength of the properly admitted evidence of the defendant's guilt, and (3) any curative actions taken by the trial court.'"  *United States v. Londondio*, 420 F.3d 777, 787 (8th Cir. 2005) (citations omitted).  As a result, a habeas petitioner "bears the heavy burden of showing that the alleged improprieties were so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair."  *Mack*, 92 F.3d at 643 (citation omitted).  "Under this

---

[12]     For purposes of analysis, the Court accepts as accurate Evans's account of the trial events in his *pro se* briefs to the state courts.

standard, a petitioner must show that there is a reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different.'"  *Id.* at 643 (emphasis added) (quoting *Jones v. Jones*, 938 F.2d 838, 844–45 (8th Cir. 1991)).

Here, even assuming the all of the prosecution's actions were improper, the cumulative effect was slight.  *Id.*; *Jackson*, 41 F.3d at 1233.  The State introduced several witnesses and pieces of physical evidence that provided either direct or corroborating evidence of Evans's involvement in Vick murder.  Under these circumstances, it is apparent that the prosecution established Evans's guilty beyond a reasonable doubt in the minds of the jurors, and there is no compelling reason to characterize the State's evidence as weak.  Jurors are presumed to follow a court's instructions and Evans does not take issue with the jury instructions.  As such, this Court presumes that the trial court's instruction eliminated any risk of impermissible inferences made from the prosecution's statements and the consideration of any improper evidence.  *Richardson v. Marsh*, 481 U.S. 200, 206 (1987).  Even if all of the alleged misconduct considered cumulatively were absent, the verdict was still likely to be the same.  Thus, Evans was not denied his right to a fair trial as a result of the prosecutor's alleged misconduct.  Nevertheless, bearing in mind the strict standard prescribed by federal law, the Court considers each of Evans's allegations of prosecutorial misconduct.

### i. Attempts to Bring in Allegedly Irrelevant or Inadmissible Evidence

Evans argues that the prosecutor's questioning was improper because it elicited irrelevant and inadmissible testimony.  (*Id.* at 119–23).  First, Evans argues that the prosecutor's questions to testifying officers about blood found on his sock were irrelevant.  (*Id.* at 119–20).  Next, he contends that questions to Officer Ryan Murray about arrests he made on the evening of May 5

31

and early hours of May 6, 2005 were irrelevant.  (*Id.* at 121–22).  Finally, Evans alleges that the prosecutor's examination of expert witness, Michael Martinez ("Martinez") "about an ongoing study done by Debra Kowal on gunshot residue (GSR) secondary transfer" violated his right of confrontation.  (*Id.* at 122–23).

Presumably, the prosecution questioned officers about blood they observed on Evans's sock to obtain a physical description of Evans at the time he was searched and placed in the squad car.  Evans was charged with first-degree murder; the presence of blood on his clothing at that time was relevant and the prosecutor did not improperly inquire about it.  Similarly, the officers' testimony about prior arrests that night may have been probative of the officers' state of mind or the physical condition of the patrol car.  Assuming *arguendo* that the testimony was irrelevant, Evans has not shown that the alleged errors were so egregious to affect the outcome of his trial.  Indeed, Evans argues that this testimony was not relevant to his case and "didn't prove or disprove a material fact."  (*Id.* at 121).  Evans has not met his burden of showing that the prosecutor's questioning on these matters rendered the trial so unfair as to deny him due process.

Evans appears to claim that because Martinez did not conduct the GSR study personally, admission of his testimony about the study's results violated Evans's right to confrontation.  (*Id.* at 123).  This argument has no merit.  Neither United States Supreme Court precedent nor the state and federal rules of evidence require that an expert personally conduct the study or test about which he or she testifies.  *Arkwright Mut. Ins. Co. v. Gwinner Oil, Inc.*, 125 F.3d 1176, 1182 (8th Cir. 1997) ("[A]n expert may rely on otherwise inadmissible hearsay evidence in forming his opinion if the facts and data upon which he relies are of a type reasonably relied upon by experts in his field."); Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed."); Minn. R. Evid.

703 ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing."); *see also Williams v. Illinois*, 132 S.Ct. 2221, 2228 (2012) ("Out-of-court statements that are related by the expert solely for the purpose of explaining the assumptions on which that opinion rests are not offered for their truth and thus fall outside the scope of the Confrontation Clause."). Evans does not challenge Martinez's ability to testify knowledgeably as an expert or his credentials. Nor does he challenge the validity of the test or its reliability among experts in the field. Thus, the prosecutor's questioning was not improper. Even if the prosecutor's questions were improper, Evans provided no basis to conclude that it was "so egregious" that it denied him due process or that, absent Martinez's testimony, the outcome of the trial would have been different. *Mack*, 92 F.3d at 643.

### ii.  Allegedly Improper Attempts to Influence the Jury

### a.  Statements Regarding the Evidence

Evans argues that the prosecutor improperly misstated the evidence at three points in the trial. First, he claims "the prosecutor intentionally misstated evidence which inflamed the passion of the jurors by telling them . . . 'and she will tell you that she believes he passed very quickly there laying in the alley'" in his opening statement. (*Id.* at 124). Second, Evans alleges the prosecution misstated evidence repeatedly when questioning witnesses about the scene of the shooting by injecting facts to which the witness had not attested. (*Id.* at 125–26). Third, Evans contends the prosecutor repeatedly misstated Strong's grand jury testimony about the description of the shooter. (*Id.* at 127–28). Based on a review of the record, this Court concludes the Minnesota Supreme Court's rejection of these claims was proper.

First, as to Evans's claims about the prosecution's opening statement, he fails to explain how the comment misstates the facts or the impact it may have had on the jury's assessment. Evans fails to identify anything suggesting jury confusion about its role as factfinder or anything suggesting the jury relied on the State's account of the shooting exclusively.  Also, there is no indication that the jury was not properly instructed about the weight to be afforded counsel's opening statements.  Even if the prosecutor's reference to anticipated testimony was somehow improper, this Court cannot conclude it deprived Evans of a fair trial or caused the jury to find against him.

Second, regarding the prosecution's questioning, it does not appear that the prosecutor was attempting to elicit inadmissible evidence.  According to Evans, the prosecution asked J.M. if there were "any other cars around" or "any other traffic around on the streets," to which J.M. replied "no."  (*Id.* at 126–27).  Evans claims this amounts to improper questioning by the prosecutor because J.M. never testified that other cars were present on the night of the shooting. (*Id.*).  Based on the record, J.M. and Strong provided inconsistent accounts about whether one or two cars were at the scene of the shooting.  *Evans I*, 756 N.W.2d at 860–61, 861 n.6.  Even if the prosecutor's observation about that anticipated testimonial inconsistency was improper, they did not deny Evans's right to a fair trial.  The witness immediately corrected the prosecutor's misstatement in front of the jury.  Simply no basis exists to speculate that the prosecutor's questions about the existence of other cars or traffic at the scene affected the trial's outcome. Similarly, Evans claims that although the witness never described a "grassy area" the prosecutor asked, "You described an open grassy area; Right?" and the witness responded affirmatively. (*Id.* at 126).  No basis has been offered to show the impropriety of this questioning and this Court will not conclude speculatively that the question affected the jury's verdict.

Finally, the prosecution's questioning of Strong about his grand jury testimony did not render Evans's trial fundamentally unfair.   Evans's trial counsel objected twice to the prosecutor's questioning as a misstatement of the grand jury testimony.  (*Id.* at 127).  In response to the objections, the prosecution restated the question.   Even if the questions are deemed improper, Evans has not demonstrated that these questions and the resulting testimony were prejudicial to the level that he was denied due process, and this Court will not speculate on his behalf.

### b.  Comments in Closing Statement

Evans asserts two types of misconduct in the prosecutor's closing statement.  First, Evans argues that the prosecutor "improperly belittle[d] and disparaged" the defense in closing statements by stating, "I talked a lot about wishing and one wish you can have is that every trial have an Andre Fenrick.   It provided, I think quite a bit[] of comic relief in a very long and difficult trial."  (*Id.* at 128).  Evans claims that the prosecutor insinuated that the witness and his testimony could not be taken seriously.  (*Id.*).  Second, Evans argues that the prosecutor "argued to the jury about what issues and facts should and should not be considered in proving [Evans's] innocence or guilt" and claims the comments were prejudicial.   (*Id.*).   He highlights three statements that he argues constitute misconduct: (1) "all the factual disputes or issues that you might have, they don't need to be resolved"; (2) "It is what it is, the GSR, and it ain't much"; and (3) "[J.M.] did tell you, the short guy with the round face killed Jerry Vick."  (*Id.* at 129).  Even if each of these statements is considered improper, Evans has not demonstrated he was denied a fair trial.

First, as to the prosecutor's comments about Andre Fenrick, although "[a] prosecutor must limit the closing argument to the evidence and the reasonable inferences that may be drawn

from it," it is permissible for a prosecutor to point to evidence suggesting that testimony was not credible.  *United States v. Eagle*, 515 F.3d 794, 805 (8th Cir. 2008); *United States v. White*, 241 F.3d 1015, 1023 (8th Cir. 2001).  The prosecutor did not rely on facts outside of the evidence presented at trial.  Nor did the prosecutor impermissibly declare that Evans was guilty.  At most, the prosecutor here merely invited an inference that Andre Fenrick lacked credibility, conduct that Supreme Court precedent permits.

Second, the prosecutor's statements about the evidence were not improper.  The prosecutor did not suggest that Evans was obliged to prove his innocence and did not negate the presumption of innocence when commenting about resolving factual disputes.  Rather, the prosecutor alluded to a truism: "beyond a reasonable doubt" does not require every factual dispute in a criminal case to be resolved beyond a reasonable doubt; only those facts that are relevant to the elements of the underlying offense must satisfy that standard.  *Winship*, 397 U.S. at 364.  Similarly, the prosecutor's statements about GSR and J.M.'s testimony were not improper because they were limited to a summation of the evidence introduced at trial and his opinion of that evidence.  *See Eagle*, 515 F.3d at 805.

Even if the prosecutor's comments are considered improper, they did not render the trial fundamentally unfair.  The Eighth Circuit has been reluctant to grant habeas corpus relief to petitioners based solely on objectionable prosecutorial rhetoric in closing arguments.  "A claim of prosecutor misconduct in closing argument . . . calls for an exceptionally limited review of this issue.  Federal habeas relief should only be granted if the prosecutor's closing argument was so inflammatory and so outrageous that any reasonable trial judge would have *sua sponte* declared a mistrial."  *James v. Bowersox*, 187 F.3d 866, 869 (8th Cir. 1999) (emphasis added).  In cases involving comments in closing statements that are more egregious than those here, the

Eight Circuit found that habeas petitioners were not denied due process.  *See Kellogg v. Skon*, 176 F.3d 447, 451–52 (8th Cir. 1999) (finding that where the prosecutor referred to the petitioner as "monster," "sexual deviant," and a "liar," while comments had "no place in the courtroom," they did not render the entire trial fundamentally unfair); *see also Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (holding that reference to the defendant as an "animal" was not a due process violation).   In comparison, it cannot be said that the prosecutor's statements in his closing argument here denied Evans's due process.   There is no reason to question the state court's determinations that "there was no prosecutorial misconduct in this case."  *Evans I*, 756 N.W.2d at 881.

### iii. Allegedly Improper *ex parte* Contact with a Juror by the Government in Anticipation of the *Schwartz* Hearing

When the district court granted Evans's motion for a *Schwartz* hearing, it decided to issue subpoenas directly to the *Schwartz* hearing witnesses.   *Evans I*, 756 N.W.2d at 864.   After editing a subpoena cover letter proposed by Evans's counsel, the court instructed the parties to work together and submit additional changes.   *Id.*  Evans's counsel requested that the following language, which both parties discussed and agreed on, be added to the cover letter:

> 'You are directed not to discuss with anyone the fact that you have received this subpoena or your participation in this matter.   However, you may speak with the attorneys working on this case or with persons who are working with the attorneys if you are contacted by them and if you wish to speak with them.'

*Id.* at 865.  The district court accepted the edits and mailed the subpoenas and the revised cover letter to five witnesses, including the juror.   *Id.*  Evans's counsel received a copy of the letter mailed to the juror, but did not object to its content or the fact that the juror received the letter.   *Id.*

The Ramsey County Attorney and a Bureau of Criminal Apprehension agent interviewed the juror at the Ramsey County Attorney's office four days before the *Schwartz* hearing was scheduled. *Id.* Thirty minutes before the hearing, Evans's counsel received a copy of the nineteen-page transcript from the State's interview with the juror. *Id.* This transcript served as the attorney's first notice of the interview. *Id.* Evans's counsel was "outrage[d]" by the late disclosure of the transcript, objected to the juror interview as a *Schwartz* violation, and moved for a continuance. *Id.* The State conceded that the timing of the transcript delivery was "unfortunate," but said the transcript was dispatched as quickly as possible. *Id.* The district court denied Evans's motion for a continuance, but granted a recess to allow counsel additional time to read the transcript. *Id.*

At the close of the *Schwartz* hearing, Evans moved for a continuance to further review the transcript of the juror's interview and investigate whether additional witnesses were necessary. *Id.* at 866. Over the State's objection, the court granted the continuance. *Id.* The hearing resumed four days later and Evans did not to call additional witnesses. *Id.* Over his objection, the State presented five additional witnesses, all of whom testified they had never heard the juror make a racist comment, knew her to have any difficulties with persons of color, personally had any difficulties with the juror, or felt the object of prejudicial behavior by the juror. *Id.*

Evans moved for an order establishing prejudice based on the State's contact with the juror or, alternatively, to strike the juror's *Schwartz* testimony and statements made during the State's pre-hearing interview. *Id.* In addition, Evans moved for judgment of acquittal or for a new trial based on C.A.'s description of the juror's comments. *Id.* The district court denied the motions and found that Evans failed to prove by a preponderance of the evidence that the juror

made the racially-biased statements alleged by C.A. or that a racially-biased individual sat on the jury.  *Id.* at 866–67.

Even if the Court assumes that the prosecution's conduct was improper, at least four events demonstrate that the proceedings were not fundamentally unfair.  First, Evans's counsel drafted and submitted the court-approved language in the cover letter.  *Id.* at 857.  He did not object to the language or the juror's receipt of the letter and the prosecution's actions here were consistent with that language and complied with the court's order.  *Id.* at 865.  Second, at the initial *Schwartz* hearing, Evans cross-examined the juror, as well as the State's other witnesses.  *Id.* at 865–66.  The court granted him recess before the juror's testimony and a continuance to review the transcript of the interview.  *Id.*  Then, at the continued hearing, Evans had a second opportunity to question the juror.  Third, the court also permitted Evans to introduce his own witnesses to testify to the alleged bias of the juror at the continued hearing, but Evans chose not to do so.  *Id.* at 866.  Finally, Evans fails to show how, absent the impropriety, the result of the trial may have been different.  As described above, the State had a strong case based on witness' testimony and physical evidence linking Evans to Vick's murder.  The prosecutor's allegedly improper contact with the juror in anticipation of the *Schwartz* hearing played little or no role in the jury's verdict.  Bearing these things in mind, Evans has not shown that the prosecution committed an error so egregious as to fatally infect the proceedings and render his trial fundamentally unfair.  *Mack*, 92 F.3d at 643.  As such, the state court's decision was not an unreasonable application of federal law.  Accordingly, his Petition should be denied on this ground.

**D. Insufficient Evidence to Prove the Offenses Charged/Violation of Due Process Because Evans's Conviction Did Not Meet "the Standard of Certainty" Required by Law (Petition Grounds Four and Eight)**

Evans and the Respondents analyzed Grounds Four and Eight together in their briefs. (Resp'ts Brief at 16); (Evans's Brief at 16).  According to Evans, both of these Grounds assert that "because [of] the insufficiency of the evidence, the prosecution did not meet the standard of certainty which law requires under the Fifth and Fourteenth Amendment of the United States Constitution." [13]  (Evans's Brief at 16).  No meaningful factual or legal distinction separates these two Grounds.  Consequently, this Report and Recommendation conflates Grounds Four and Eight and considers them as one claim for insufficient evidence to prove each element of the offense charged, resulting in Fifth and Fourteenth Amendment due process violations.

Evans alleges that the evidence offered at trial was insufficient as a matter of law because the State failed to prove all of the elements of first-degree murder.  (Evans's Brief at 16–20). Specifically, Evans argues that insufficient evidence was offered to prove that Sergeant Gerald Vick ("Vick") was "engaged in the performance of official duties" at the time of his death, as required by Minnesota Statute § 609.185(a)(4).  (Evans's Brief at 16–20).  According to Evans, his conviction runs afoul of *Jackson v. Virginia*, 443 U.S. 307 (1979), and *In Re Winship*, 397

---

[13]     Grounds Four and Eight are described in the Petition as follows:

Ground four: The Government failed to produce sufficient evidence on every element of the offense charged. . . .  Material facts exist and prove that the decea[sed] victim was in violation of state and Federal law that was inconsisten[t] with the verdict, and circumstantial evidence shows the state witnesses could have committed the crime and not the defendant.
. . .
Ground eight: conviction was obtained by violation of due process and insufficiency of evidence. . . .  [T]he verdict and sentencing denied the petitioner a fair trial when evidence did not meet the standard of certainty which is required under the law.

(Pet. at 5, 8).

U.S. 358 (1970), because it eliminates the state's burden to prove every element of the crime beyond a reasonable doubt.   (Evans's Brief at 18–20).   Because the state court found that Minnesota's *Knaffla* rule barred this argument and no exception applies, it is procedurally barred for federal habeas purposes.   Notwithstanding the procedural default, Grounds Four and Eight fail on the merits.

### 1.   Relevant Facts

Three witnesses provided testimony relevant to whether Vick was "engaged in the performance of official duties" the night of his murder.   *Evans I*, 778 N.W.2d at 879–880.   First, Vick's vice unit partner, Sergeant Joseph Strong ("Strong"), testified that he and Vick were on duty on the night of the shooting.   *Id.* at 859.   At approximately 10:30 p.m. on May 5, 2005, Strong and Vick went to a bar to investigate prostitution in the area.   *Id.*   Because they were undercover, Strong and Vick wore casual clothing and drank alcohol to fit in with other patrons. *Id.*   The officers spoke with two suspected prostitutes and the women invited them to Erick's Bar to play pool.   *Id.*   Strong and Vick welcomed the opportunity to go to Erick's Bar with the women because the officers' appearance there on their own would attract attention.   *Id.*   Strong and Vick drove separately to Erick's Bar in their assigned, unmarked police vehicles.   *Id.*   Over the course of the evening, they played pool and ordered alcoholic drinks, paying for them with funds provided by the police department.   *Id.*   Although it became clear that their prostitution investigation would not yield any arrests that night, they stayed at the bar until closing time to look for signs of any other illegal activity and to socialize with patrons so that they could enter the bar less conspicuously in the future.   *Id.*   Shortly after leaving the bar, Vick and Strong encountered Antonio Kelly ("Kelly") and Evans.   *Id.*  859–61.

41

Second, Commander Todd Axtell ("Axtell") testified that Vick was on duty when he was shot because Vick's shift continued until 2:30 a.m. on May 6, 2005.[14]   *Id.* at 879.   Axtell also reasoned that Vick was on duty because he had not yet returned his city-owned undercover vehicle to the police department.   *Id.*   He further testified that officers are expected to act whenever they observe criminal activity at any time in St. Paul.   *Id.*

Finally, St. Paul Police Chief John Harrington ("Harrington") testified that the St. Paul Police Department considered Vick to be on duty at the time of his death.   *Id.*   He explained that the department followed the protocol for when officer dies in the line of duty, including paying Vick's survivors line-of-duty benefits and proceeding with special arrangements at Vick's funeral.   *Id.*   Harrington's testimony was also consistent with Strong's testimony that undercover officers may consume alcohol while on duty.   *Id.* at 879–880.

Evans claimed in his *pro se* brief to the Minnesota Supreme Court on direct appeal that the State's evidence was insufficient to prove that Vick was "engaged in the performance of official duties" at the time of his murder.   *Id.* at 879; (Admin. R. at 106–12).   He noted that Vick's blood-alcohol concentration was twice the legal limit when he was driving and that Minnesota state law prohibits a person with a blood-concentration above .04% from carrying a pistol.   *Evans I*, 756 N.W.2d at 879; (Admin. R. at 108–11).   The Minnesota Supreme Court conducted a "thorough review of the record 'to determine whether the evidence, when viewed in a light most favorable to the conviction, was sufficient to permit the jurors to reach the verdict when they did.'"   *Evans I*, 756 N.W.2d at 879 (citing *State v. Fields*, 679 N.W.2d 341, 348 (Minn. 2004)).   The court found the testimony of Strong, Axtell, and Harrington provided

---

[14]     Based on J.M.'s testimony, the shooting took place at "about 2 a.m" on May 6, 2005. *Evans I*, 756 N.W.2d at 861.

sufficient evidence to show that Vick was on duty as a police officer when he was killed.[15]  *Id.* at 880.

On appeal from the postconviction court's decision, the Minnesota Supreme Court construed Evans's *pro se* brief to assert two arguments regarding whether Vick was on duty at the time of his death.  (Admin. R. at 379–83).  First, the court interpreted Evans's brief as alleging that "the court erroneously determined that Vick was performing official duties at the time of the shooting."  *Evans II*, 788 N.W.2d at 44.  The Minnesota Supreme Court found that *Knaffla* barred this claim because it was based on the trial record, and therefore it was known or should have been known to Evans at the time of his direct appeal.  *Evans II*, 788 N.W.2d at 44.  Second, the court considered Evans's brief to assert a claim "that Vick was not performing official duties."  *Evans II*, 788 N.W.2d at 44.  The court implicitly found *Knaffla* also barred this claim, explaining that it had "already considered and rejected [that] claim on direct appeal, [and] conclude[ed] that there was sufficient evidence showing that Vick was performing official duties when he was murdered."  *Evans II*, 788 N.W.2d at 44.  With that, the court summarily denied Evans's request for relief as to this claim, pursuant to Minnesota Statute § 590.04.  *Evans II*, 788 N.W.2d at 44.

### 2.  Procedurally Defaulted

To exhaust state court remedies, a petitioner must fairly present his constitutional claims to the highest available state court before seeking federal court relief.  *O'Sullivan*, 526 U.S. at 845.  A claim has not been fairly presented if a state appellate court expressly declines to address the merits because the petitioner violated state procedural rules.  *Hall v. Delo*, 41 F.3d 1248,

---

[15]     The court also considered a "general sufficiency" argument from Evans and concluded that the testimony and evidence presented at trial "was sufficient to support the conviction."  *Evans I*, 756 N.W.2d at 880 n.31; (Admin. R. at 112).  Evans's Petition did not present a "general sufficiency" argument and the Court finds no reason to review this conclusion.

1250 (8th Cir. 1994). Further, a federal court should abstain from considering whether a state court's properly applied its procedural rule. *See Clemons v. Luebbers*, 381 F.3d 744, 750–51 (8th Cir. 2004) ("federal courts do not look at whether state courts have correctly applied their own procedural rules[;] [t]hey simply determine whether those procedural rules were applied to bar the claim"); *Murray*, 269 F.3d at 899 ("it is not the province of a federal court to decide whether a matter ought to be considered procedurally defaulted under state law"). This claim is procedurally defaulted because it was not "fairly presented" to the Minnesota Supreme Court pursuant to *Knaffla*. *Hall*, 41 F.3d at 1250.

Evans has not cited any reason to excuse his procedural default and nothing suggests that his failure to comply with Minnesota's *Knaffla* rule was the result of any external impediment. *Id.* Moreover, no new evidence has been proffered that proves Evans did not commit the crimes for which he was convicted. *Coleman*, 501 U.S. at 750. Although Evans claims that McClinton's statements prove that Kelly lied during his testimony and that Kelly was the shooter, in light of the other evidence supporting his conviction analyzed below, his innocence has not been conclusively proven. Therefore, Evans cannot satisfy the actual innocence exception to overcome his procedural default.

### 3. Analysis on the Merits

Notwithstanding Vick's alcohol consumption, which provides Evans with his primary basis for Grounds Four and Eight, substantial testimony established that Vick was "engaged in the performance of official duties." First, Harrington testified that that the police department found Vick was "engaged in the performance of official duties" because they followed line-of-duty procedures in handling Vick's funeral and benefits to his family. *Evans I*, 756 N.W.2d at 879. Second, Axtell testified that Vick's shift did not end until about thirty minutes after the

shooting occurred.  Third, Strong testified that undercover officers may consume alcohol while undercover, a claim Harrington corroborated.  *Evans I*, 756 N.W.2d at 879–80.  Moreover, according to Minnesota case law, lack of knowledge of a victim's true identity as a police officer has no impact on a defendant's conviction under Minnesota Statute § 609.185.  *Evans I*, 756 N.W.2d at 875–76 (citing *State v. Angulo*, 471 N.W.2d 570, 572–73 (Minn. Ct. App. 1991)).  Thus, the Minnesota Supreme Court's conclusion that the evidence was legally sufficient to sustain Evans's conviction is not an unreasonable determination of the facts.  *See* 28 U.S.C. § 2254(d)(2).  Nor was their decision contrary to or an unreasonable application of federal law.  *Id.*

### E.  Denial of Due Process Based on New Evidence Establishing Innocence (Petition Ground Eleven)

In Evans's final Ground for relief, he argues that the state courts improperly applied the standards for a new trial and evidentiary hearing and deprived him of "due process under Minnesota law."[16]  (Pet. at 8).  Ground Eleven is procedurally defaulted because Evans never presented a federal dimension to the Minnesota Supreme Court and state law prevents him from doing so.

---

[16]     A federal court's review "is limited to deciding whether a conviction violated the [federal] Constitution, laws, or treaties of the United States" in conducting habeas proceedings.  *Estelle*, 429 U.S. at 68.  To fairly present a claim, the prisoner must do more than outline the underlying facts or "make a general appeal to constitutional guarantee as broad as due process."  *Turnage*, 606 F.3d at 936 (quotations omitted).  Evans does not present an issue cognizable for habeas review as to Ground Eleven in his Petition, responsive brief, or brief on appeal from the postconviction court.  (Pet. at 8); (Evans's Brief at 22–23).  Thus, even if Evans had fairly presented this claim to the state courts, his filings to this Court do not presented a federal issue cognizable for review.

### 1.  Relevant Facts

At trial, Evans argued that Kelly was the shooter.  *Evans I*, 756 at 877.  Following

resolution of his direct appeal, Evans learned from his appellate counsel

> that statements relating to [his] case were made to St. Paul police during an
> investigation into a 2008 murder.  The statement or statements were made to Sgt.
> Payne by a possible witness in the trial of a[nother] person. . . .  The possible
> witness, named McClinton, told police that he was told by Antonio Kelly that
> Kelly shot Sgt. Gerald Vick.

*Evans II*, 788 N.W2.d at 43.

Evans filed a *pro se* petition for postconviction relief, arguing that McClinton's

statements provided him with two bases for a new trial or evidentiary hearing.  (Admin. R. at

351–56).  First, he claimed Kelly's allegedly recanted testimony necessitated a new trial or

evidentiary hearing because it proved Kelly lied on the stand.  (*Id.* at 353–56).  Second, Evans

argued that he was entitled to a new trial or evidentiary hearing because McClinton's statements

constituted "new evidence."  (*Id.* at 365–58).  The postconviction court granted the State's

motion to dismiss Evans's petition for postconviction relief and denied Evans's request for a new

trial or an evidentiary hearing.  *Evans II*, 788 N.W.2d at 43.

On appeal, Evans asserted that the postconviction court "incorrectly applied the standard

by which to determine whether to grant a new trial or to hold a post-conviction evidentiary

hearing on [his] claim of newly discovered evidence of recanted statement by Antonio Kelly."

(*Id.* at 351).  Evans provided four primary arguments related to this claim.  First, he argued that

the postconviction court "misapply[ed]" Minnesota case law and statutes when it considered the

veracity of Kelly's recantation without holding an evidentiary hearing to evaluate his credibility.

(Admin. R. at 356).  Second, Evans argued that the postconviction court "misstated and

misapplied the second [*Larrison*] factor."  (*Id.* at 354).  Third, Evans emphasized that the third

*Larrison* factor is "not an absolute condition precedent" according to Minnesota case law.  (*Id.* at 355).  Finally, Evans asserted that the postconviction court improperly applied Minnesota's test for a new trial based on new evidence.  (Admin. R. at 356–58).  Evans stated that the "grant of a new trial on the basis of witness recantation is determine[d] by the three-prong test set forth in *Larrison.*"  (*Id.* at 353).  Evans also cited Minnesota case law and statutes that provide the correct standard and noted that "[t]he showing required in order to receive an evidentiary hearing is lower than that required to receive a new trial."  (*Id.* at 356).

The Minnesota Supreme Court court first applied the three-pronged test set forth in *Larrison v. United States*, 24 F.2d 82, 87–88 (7th Cir. 1928), to determine whether the postconviction court should have ordered a new trial.  *Evans II*, 788 N.W.2d at 47–48.  Under *Larrison*, a petitioner is entitled to a new trial based on recanted testimony if:

> (1) the court [is] . . . reasonably well-satisfied that the trial testimony was false; (2) without the false testimony, the jury might have reached a different conclusion; and (3) the petitioner was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial."

*Id.* (citation omitted).  The court relied on physical evidence presented at trial and the testimony of J.M. and Strong to conclude that Evans was not entitled to a new trial because he failed to prove the second prong of *Larrison*.  *Id.* at 48–49.  Citing *Opsahl v. State*, 677 N.W.2d 414, 423 (Minn. 2004), the Minnesota Supreme Court found Evans's failure to establish the second *Larrison* prong dispositive and ended its analysis.  *Id.* at 48.

Next, the court considered whether Evans was entitled to a new trial on the basis that McClinton's statements constituted new evidence.  *Id.* at 49.  The court stated Minnesota law requires Evans to establish four elements to earn a new trial because of newly discovered evidence:

(1) that the evidence was not known to the defendant or his/her counsel at the time of the trial; (2) that the evidence could not have been discovered through due diligence before trial; (3) that the evidence is not cumulative, impeaching, or doubtful; and (4) that the evidence would probably produce an acquittal or a more favorable result.

*Id.* (citing *Rainer v. State*, 566 N.W.2d 692, 695 (Minn. 1997)).   Ending its analysis after consideration of the first prong, the court found that Kelly's admission could not have been "unknown" to Evans because Evans was present at the shooting.  *Id.* (citing *Whittaker v. State*, 753 N.W.2d 668, 671–72 (Minn. 2008) ("testimony cannot be 'unknown' if the petitioner was admittedly present at the time of the events the witness purports to describe"); *Pierson v. State*, 637 N.W.2d 571, 577 (Minn. 2002) (concluding that the petitioner "undoubtedly knew that [the witness] had information regarding [petitioner's] involvement" where the petitioner and witness were together during the events in question).

### 2.   Procedurally Defaulted

The details of the Minnesota Supreme Court's decision need not be recapitulated here because Evans's claims and the court's evaluation of those arguments were "confined to matters of state law."  *Turnage v. Fabian*, 606 F.3d 933, 939 (8th Cir. 2010).  It is "patently obvious" that the court's analysis of Evans's claims to an evidentiary hearing under Minnesota statutes and case law was confined to state law.  *Turnage*, 606 F.3d at 939.  It is "perhaps less obvious" that Evans's claim for a new trial under *Larrison* is also simply a matter of state law because that is a federal case.  *Turnage*, 606 F.3d at 939.  "Nevertheless, *Larrison* has no readily discernible constitutional underpinnings."  *Id.*  "[T]he Minnesota Supreme Court's application of the *Larrison* test . . . was entirely a matter of state law."  *Turnage*, 606 F.3d at 939–40.  Thus, Evans did not fairly present a federal dimension to the Minnesota Supreme Court on this claim.  *See Baldwin*, 541 U.S. at 29.  Further, because Evans knew about this federal due process claim the

48

claim when he filed his postconviction petition, it is not novel and Minnesota law precludes Evans from returning to the state courts to assert it. *See Powers v. State*, 731 N.W.2d 499, 501 (Minn. 2007) (citation omitted) ("matters raised or known but not raised in an earlier petition for postconviction relief will generally not be considered in subsequent petitions for postconviction relief"). Thus, this claim is procedurally defaulted. *Baldwin*, 541 U.S. at 29.

Evans made no attempt to show cause for failing to present this federal due process claim to the Minnesota Supreme Court and none is evident from the record. He may obtain review of his claim "only if it falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" *Schlup*, 513 U.S. at 314–15. The miscarriage-of-justice exception requires petitioners to present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial." *See Schlup*, 513 U.S. at 316. Evans implicitly invokes the miscarriage-of-justice exception by suggesting that McClinton's statements prove his innocence. (*Id.* at 351–58). The postconviction court found that McClinton's statements would likely not have resulted in the jury finding Evans innocent of murder because other evidence introduced at trial linked him directly to the crime. *Evans II*, 788 N.W.2d at 48–49. The record supports that assessment. In their testimony, J.M. and Strong described the crime scene and identified Evans as the only plausible shooter. Physical evidence introduced at trial, including gun casings seized from Evans's home and DNA evidence on the murder weapon that matched Evans, corroborated their testimony. Evans's assertions concerning his alleged innocence are insufficient to overcome that evidence. *See Storey v. Roper*, 603 F.3d 507, 524 (8th Cir. 2010) (explaining that to show a "fundamental miscarriage of justice," the petitioner must show "he is actually innocent").

Given the other evidence introduced at trial and detailed elsewhere in this opinion, including the testimony of J.M., Strong, Axtell, and Harrington, and physical evidence corroborates links Evans to the murder, Evans's assertions concerning his alleged innocence are insufficient to satisfy the exception. *See Schlup*, 513 U.S. at 316 (explaining that the miscarriage-of-justice exception requires petitioners to present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial"); *see also Storey v. Roper*, 603 F.3d 507, 524 (8th Cir. 2010) (explaining that to show a "fundamental miscarriage of justice," the petitioner must show "he is actually innocent").

## IV.   EVANS'S MOTION TO AMEND

Evans also filed a collateral Motion for Leave to Amend his Petition. (Notice of Mot. and Mot. for Leave to Amend) [Doc. No. 25]. He seeks to amend his Petition "to rid [it] of errors because it was hastily filed in order to comply with the AEDPA [s]tatute of limitations." (Mot. for Leave to Amend) [Doc. No. 24 at 1]. Evans failed to provide a proposed amended petition clearly identifying the amendments he intends to make. Based on his Notice of Motion and Motion for Leave to Amend [Doc. No. 25] and his Declaration/Motion of Petitioner in Support of Motion for Leave to Amend [Doc. No. 24], however, he seeks to remove his procedurally defaulted claims to conform with the Court's August 29, 2011 Order [Doc. No. 18].

As a general matter, 28 U.S.C. § 2242 provides that a writ of habeas corpus may be amended as dictated in the Federal Rules of Civil Procedure. According to Federal Rule of Civil Procedure 15, "[t]he court should freely give leave [to amend] when justice so requires." Nevertheless, his Motion is denied for two reasons. First, Evans's proposed amendments are futile because he seeks only to remove those Grounds that the Court deemed procedurally defaulted and dismissed with prejudice. The removal of those Grounds has no impact on the adjudication or outcome of the proceedings on his Petition. *See Knapp v. Hanson*, 183 F.3d 786,

790 (8th Cir. 1999) ("[F]utility constitutes a valid reason for denial of a motion to amend.)

Second, because the Court recommends the denial of his Petition on the merits, his Motion is

moot.  Therefore, Evans's Motion for Leave to Amend should be denied.

## V.    EVIDENTIARY HEARING

Evans's responsive brief, entitled "Response to Respondent's Brief & Evidentiary

Hearing Requested," presumably seeks an evidentiary hearing.  [Doc. No. 23].  This Court is

bound by 28 U.S.C. § 2254(e)(2) regarding evidentiary hearings.  Section 2254(3)(2) sharply

curtails a court's ability to hold an evidentiary hearing unless the petitioner shows that

> (A) the claim relies on –
>> (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>> (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2254(e)(2).  Evans failed to articulate any basis for his request.  He has not satisfied

the stringent requirements prescribed in § 2254(e)(2) and there is nothing on the record to

believe he could do so.  Accordingly, this Court recommends denial of Evans's request for an

evidentiary hearing.

## VI.    CERTIFICATE OF APPEALABILITY

A § 2254 habeas corpus petitioner cannot appeal a denial of his petition unless he is

granted a Certificate of Appealability ("COA").  28 U.S.C. § 2253(c)(1); Fed. R. App. P.

22(b)(1).  A COA cannot be granted, unless the petitioner "has made a substantial showing of the

denial of a constitutional right."  28 U.S.C. § 2253(c)(3).  To make such a showing, "[t]he

petitioner must demonstrate that reasonable jurists would find the district court's assessment of

the constitutional claims debatable or wrong." *Slack v. Daniel*, 529 U.S. 473, 484 (2000).  A COA will not necessarily be granted simply because an appeal is pursued in good faith and raises a non-frivolous issue.  *Kramer v. Kemna*, 21 F.3d 305, 307 (8th Cir. 1994) ("[g]ood faith and lack of frivolousness, without more, do not serve as sufficient bases for issuance of a certificate").

In this case, the Court finds it unlikely that any other court, including the Eighth Circuit Court of Appeals, would decide Evans's claims any differently than they have been decided here. Evans has not identified, (and the Court cannot independently discern), anything novel, noteworthy or worrisome about this case that warrants appellate review.  It is therefore recommended that Petitioner **not** be granted a COA in this matter.

## VII.   RECOMMENDATION

Based upon the foregoing and all of the files, records, and proceedings herein, **IT IS HEREBY RECOMMENDED** that:

1.   Evans's Petition Under 28 U.S.C. § 2254 for Writ of Habeas Corpus by a Person in State Custody [Doc. No. 1] be **DENIED**;

2.   This action be **DISMISSED WITH PREJUDICE**;

3.   Evans's Motion for Leave to Amend his Petition [Doc. No. 25] be **DENIED**;

4.   Evans's request for an evidentiary hearing be **DENIED**; and

5.      Evans **NOT** be granted a Certificate of Appealability.

Dated:  July 30, 2012

s/ Steven E. Rau_____
STEVEN E. RAU
United States Magistrate Judge

Under D. Minn. LR 72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and serving all parties by **August 13, 2012,** a writing which specifically identifies those portions of this Report to which objections are made and the basis of those objections.  Failure to comply with this procedure may operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.  A party may respond to the objecting party's brief within ten days after service thereof.  A judge shall make a de novo determination of those portions to which objection is made.  This Report and Recommendation does not constitute an order or judgment of the District Court, and it is therefore not appealable to the Court of Appeals.